STATE OF IOWA, Appellee, v. LYLE JOHNSON, Appellant.

No. 43341.

OCTOBER 20, 1936.

REHEARING DENIED FEBRUARY 12, 1937.

Edward L. O'Connor, Attorney General, and Walter F. Maley, First Asst. Attorney General, and Marshall F. Camp, County Attorney, for appellee.

E. F. McEniry, Thomas E. Mullin, and C. H. Williamson, for appellant.

PARSONS, C. J.—The defendant was tried on a county at-

torney's information filed August 10, 1935, which read as follows:

"Comes now Marshall F. Camp, as County Attorney of Union County, State of Iowa, and in the name and by the authority of the State of Iowa, accuses Lyle Johnson of the crime of Rape, committed as follows:

"The said Lyle Johnson on or about the 29th day of July, 1935, in the County of Union and State of Iowa, raped Mary Thomas.

"[Signed] Marshall F. Camp, County Atty."

There was evidence in the case from which a jury might have found the following facts from the State's evidence in chief:

Mary Thomas was a motherless girl who lived with her father in Creston, she being unmarried; that her mother died in 1934; that her aunt, Mrs. Sowash, on July 19, 1935, was confined in the hospital in Creston and Mary was called to the hospital to look after her aunt, and on that evening, about six o'clock, she started to the hospital on a call to go there for that purpose; that the defendant, driving a Ford coupe Model A, came along while Mary was on the way, and stopped his car and said, "Pardon me", and Mary walked over to the car, and the defendant grabbed her and pulled her into the car. She then told the defendant: "I am supposed to be at the hospital right away and if I am not there right away they will start looking for me. It will be too bad for you if my father catches you", and he said, "Well he won't find us where we are going"; and that she tried to jump out of the car and defendant said: "What are you trying to do, kill yourself?" and Mary replied: "I would just as soon as have you touch me"; that defendant then held her in the car and drove to the corner of the Golf Club and turned south; that when he stopped his car Mary jumped out and ran up the road, but he caught her and hit her on the jaw, then took her back to the car, and there had intercourse with her; that she hit him, and just then a Mr. Tobin approached in his car and the defendant told Mary to keep quiet or he would kill her, and when defendant started his car she jumped out and ran to Mr. Tobin's car. That defendant's car left immediately and Mary told Mr. Tobin the defendant was hitting her, and Tobin asked her if he had completed the attack and she said "No". That they followed

the defendant's car, but finally lost him, and they went back to town where they saw defendant's car in front of Kelly's beer parlor; that she saw defendant again that night at the jail and identified him; that she did not tell anyone that night that she had been raped.

William Hiatt, a policeman, testified that he inspected defendant's car in front of Kelly's beer parlor, and located defendant in the Strand theatre, and when he asked defendant what his name was Johnson said it was Milhaulen; that at that time the defendant was sitting in the middle row alone in the theatre, about half drunk; that the policeman said when he looked in the car he did not see that the seat covers had been disarranged.

It appeared further in the evidence that the defendant had been at Hobson's beer parlor where he drank some beer, had been at Kelly's where he drank beer, then went to Harper's to get something to eat, and again drank some beer. That a Ruth Gorman testified about drinking beer with the defendant and that he had a paper with an address on it, and defendant said he was going there to see a woman. That another woman testified she saw the defendant with a man named Milhaulen and drank beer with him about five o'clock, and then went to Kelly's and drank more beer, and then to Harper's where they had a sandwich and had more beer, and that defendant left with a paper in his hand with the address 601 Mill Street, and said he was going out to see a woman on Mill Street.

Two physicians testified that they had examined the plaintiff and found a tear in the lower left of the hymen and evidence of laceration and bruising of the tissue, giving evidence that something had been inserted into the vagina not many days previous. That this examination was about two days after the happening. Another physician testified to the same facts, and said he found bruises on the back part of Mary's arm, a painful shoulder and a painful area along the front part of her body; and that when he examined her he found the hymen membrane had apparently been torn within a week's time.

Mr. Tobin testified as to Mary running to his car at the Golf Club, and as to the following of defendant uptown and losing him, and said it was between 6:30 and 7 o'clock in the evening. He testified that the girl jumped out of defendant's car screaming; that it was Mary Thomas; she came tearing up

the road, jerked the door of his car open and jumped in; that she was screaming and tears were running down her face; she said, "I sure am glad you came"; that she was very much excited and her face very red; that he said, "What's going on here" and she said that fellow hit her, that fellow in the car. That he remembered the car as having an Adair County No. 1 license, with three numbers, which he did not get. That he asked her if she wanted him to find out who it was, and she said "Yes", and that they started out. That defendant left in pretty much of a hurry; that Mr. Tobin got sight of him just once, at Adams Street, and he wanted to see which way defendant was going, and when he saw him going east he started out after defendant. Tobin claimed his car was pretty good on speed, but no good on pickup. He said he could not have heard any screams before he stopped his car; that Mary had run fifteen feet when she got in his car.

When the State rested the defendant moved for a directed verdict on the ground that the evidence offered on behalf of the State did not contain any corroboration which was sufficient to tend to connect the defendant with the crime charged, or any other crime, and that if the jury returned a verdict of guilty it would be the duty of the court to set it aside for the reason that there was no corroboration tending to connect the defendant with the commission of the crime; and that under no circumstances could complaints, opportunity or any other evidence offered by the State, tend to corroborate the prosecuting witness and tend to connect the defendant with the crime charged.

The motion was properly and promptly overruled.

The defendant's evidence then came on and there was testimony as to the circumstance of picking Mary up, and Johnson himself testified that he was a farmer, 27 years of age, resided in Adair County with his wife, and that he and Milhaulen came to town in his car, a 1929 brown Ford coupe; he testified as to going to Kelly's place, and as to having a piece of paper in his hand with an address on it, an old schoolmate who lived on Mill Street with her husband; and that he picked up Mary at the intersection of Mill and Division Streets, in full view of everybody, and that they sat there and kissed each other, that he loved her a little bit, and there was no talk or act of intercourse. That pretty soon she said, "Here comes a car", and she started to jump out and he said, "What are you trying to do, kill your-

self?'' That she ran back to the other car screaming and got into the other car, and he thought it was her husband. That he did not know the streets, but that as soon as he found the other car was not following him any more he went back and parked in front of Kelly's beer parlor, then went to look for Milhaulen and later went to the Strand Theatre. That on Wednesday morning his mother told him at the jail that the county attorney said if he would plead guilty he was sure he could get it changed to assault and battery, and that he told his mother he was not guilty of anything. He admitted on cross examination that he was with Lizzie Clark and Ruth Gorman, and as to being at Kelly's and Harper's, and that when the officer came into the show he thought the girl had a husband, but as soon as they got outside he admitted who he was; that he admitted it was his car, and that when he was put in jail he told them he had not done anything to the girl.

■■■ At the conclusion of the evidence the State moved to strike out the evidence of Mr. and Mrs. Lon Pierson, witnesses for the defendant, for the reason that same was incompetent, irrelevant, and immaterial, and not properly connected up, which motion was sustained and defendant excepted to the ruling.

Mrs. Lon Pierson testified simply that she lived at 308 No. Division Street, just a little north of where Mill Street intersects with Division Street; that she saw a car across the street where a girl got into it; that she saw the girl wave her hand as she approached the car, and she went around and got into it; that there was no screaming, grabbing or pulling or anything like that, and the car drove on south.

Lon Pierson testified to about the same facts; also testified to seeing the car license and noted it was County License No. 1; that the car was a brown Model A one-seated car; that there was no further identification as to who the parties were in the car, or who it was that attempted to get in, but that the girl stepped out and waved her hand, the man stopped the car and she went around and got in. He said it looked to him as if they had a date to meet at that corner.

In view of the record we think there was no error in this ruling. The court said in ruling on the motion to strike this testimony that there was absolutely no connection between the testimony of these witnesses and that of the other witnesses; that they did not fix any date; that they did not identify the

girl as the one in court; and that all the circumstances related by them were so uncertain as to be immaterial in the case, and would be only collateral in any event. With these statements of the court we thoroughly agree.

The defendant himself admits she was in the car with him; possibly differs somewhat about where she was picked up, the girl saying she was picked up at Oak and Mill Streets, and the Piersons saying it was at the intersection of Mill and Division Streets.

At the close of all the evidence the defendant renewed his motion for a directed verdict, which motion was overruled by the court, and exceptions were taken. In this we see no error.

The court thereupon instructed the jury, giving instructions from No. 1 to No. 18, inclusive, and gave five forms of verdict; one as to rape; one as to the included crime of assault with intent to commit rape; one as to include crime of assault and battery; one to include crime of assault, and one to find the defendant not guilty.

The jury returned a verdict of "Assault with intent to commit rape". The defendant filed exceptions to the instructions No. 12 and No. 15. Instruction 12 was as to the question of flight of the defendant and denying his identity. The instruction 15 was as to defendant being a competent witness in his own behalf.

We have examined both these instructions and find nothing therein that is objectionable, and that the instructions were proper in the case.

Motion for new trial was based on the claim that the verdict was returned by insufficient evidence and without competent corroborating evidence of the prosecuting witness; that the court erred when he withdrew from consideration the evidence testified to by the witnesses Lon Pierson and his wife; that the court erred in permitting the introduction of Exhibit A into the evidence. Complaint is made as to the court admitting Exhibit A. This exhibit was what was called "step-ins". In connection with this testimony we quote as follows:

"Exhibit A is my step-ins, and they are in the same condition now as they were at that time. My last menstruation period before that time was the 14th of July, and the next period after that time was the 20th of August. I never had intercourse with

anyone before this time, and never consented to Lyle Johnson having intercourse with me on the afternoon of July 29th." Mary had testified as to these step-ins as follows: "I did not notice blood right then, but I did the next morning. There was some substance on my step-ins." "I tried to kick him, and was hitting him all the time, and I screamed as loud as I could." The witness further testified she did not tell anyone because she was ashamed; that she did not know who to tell. That she did everything she could to keep him from having intercourse with her; that there was no one around to hear her scream; that she told Tobin that Johnson was hitting her, and when Tobin asked her, "Did he attack you?" she said "Yes". Then Tobin asked her if she wanted him to chase the defendant and she said "Yes". That up to that time she did not know who Johnson was.

On the overruling of the motion for new trial the court sentenced the defendant to be committed at hard labor to the penitentiary at Fort Madison, for an indeterminate period of not to exceed twenty years, and to pay the costs of this action, which were $136.90, to all of which ruling the defendant duly excepted.

In this record we are considering whether there was sufficient evidence to convict the defendant and to sustain the verdict rendered in the case, to wit: "Guilty of assault with intent to commit rape."

In the brief of defendant is set forth section 13900 of the code, which provides:

"The defendant in a prosecution for rape, or assault with intent to commit rape * * * cannot be convicted upon the testimony of the person injured, unless she be corroborated by other evidence tending to connect the defendant with the commission of the offense."

What does this section mean? It simply means that the injured person must be corroborated by other evidence to connect the defendant with the commission of the offense. It puts no more limitation in the treatment of cases of this character than on any other criminal case, except the corroboration connecting the defendant with the commission of the offense. Mary was with him at the time when Tobin drove up; she jumped out of the defendant's car and ran over to Tobin's car; and while she

didn't say defendant committed that particular crime, she told Tobin that Johnson hit her. She testified she was ashamed to tell what took place. True, opportunity alone to commit the crime cannot in any way constitute corroboration, neither can complaints made to other persons in regard to the crime be taken as corroborating evidence. But her testimony alone is sufficient to establish that the crime was committed, and the time and place of the commission of the crime. The statute does not limit her in this right, but simply says she must be corroborated in singling out, pointing out, the defendant as the person who committed the crime. He was there, and she was there, and nobody else was there until Tobin drove up. Mary immediately fled from defendant's car; she had no more than got into Tobin's car when defendant fled, went uptown; left his car in front of Kelly's place and then went off to a theatre; and denied his own name and said he was Milhaulen when he was first approached by the officers. If this does not constitute corroboration, pointing out and singling the defendant out as the one who committed the crime, then corroboration cannot be defined. Mary does not have to be corroborated as to the details; or that she was dragged into the car. Her story is entitled to credence. The fact that the defendant had been at the place of the crime for some time and fled as soon as a third party came on the scene, certainly is about as strong corroborating evidence as can be had. There cannot be found in the books a single case that denies any such state of facts as these being corroborating. In his own testimony, Johnson says that he kissed Mary in the car, and that she kissed him,—a perfectly strange girl he had never seen before, followed by the commission of this crime. So evident are these facts that if the crime were committed at the time and place testified to, then no more authority need be cited to support so evident a proposition.

█ █ The next error complained of is the striking of the testimony of the Piersons. Neither of the witnesses was able to identify either the man or the girl; they made no attempt to identify them, therefore their testimony was immaterial. It was immaterial as to the description of the car. Not only that, but when the proposed testimony was offered and objection was made, counsel for the defendant made professional statement that they would connect up the proposed testimony of these witnesses. The county attorney had said: "Just a minute. That

is objected to, unless it is shown that this witness claimed that girl was Mary Thomas, it would be immaterial." The court: "On the professional statement of counsel he will connect it up, the witness may answer." It is apparent counsel misled the court into believing the testimony could be properly connected up, and relying on the professional statement of counsel, the testimony was admitted. But when it became apparent, after the testimony was admitted, that there was no attempt to connect the testimony up properly, the court on motion of the State struck the same from the record. The professional statement is also set out in the additional abstract filed by the State. So we see no error here. There was no identification of the man; no identification of the girl.

■■■ Division III of the argument of appellant is aimed at instruction 12 given by the court, which was a "flight" instruction, and he merely told the jury that if they found that soon after the alleged commission of the offense defendant fled from the scene of the crime and sought to evade arrest, and made denial upon his arrest of his name, they might consider this as circumstances tending to establish guilt of the offense. But he further told the jury that it was its duty to consider the explanation given by the defendant of his acts and conduct, at and before his arrest, and if the acts and conduct of the defendant are explained upon any other theory than that of guilt, then any flight or attempt to avoid arrest, or denial of identity, is not to be considered as indication of guilt. The defendant objects to this and contends that the "flight" instruction should not have been given; that the evidence fails to show that the defendant did, as a matter of fact, fly from the scene of the alleged crime. Of course he didn't "fly", he did not have wings, but if starting up his automobile and getting away as fast as he could isn't within the meaning of this word "fly", we are very much mistaken. The defense counsel in argument say they are unable to find any authority which holds that "fly" alone constitutes corroboration. That is true, perhaps, and it is perhaps true it would not constitute corroboration as tending to connect the defendant with the offense, but there is plenty in this evidence to connect him with the commission of the offense, if it were committed, and the girl's testimony alone is sufficient to establish that. Generally, the following cases support the proposition as laid down herein: State v. Taylor, 196 Iowa 1015, 192 N. W.

294; State v. O'Meara, 190 Iowa 613, 177 N. W. 563; State v. Geier, 184 Iowa 874, 167 N. W. 186; State v. McPursley, 144 Iowa 414, 121 N. W. 1031, 122 N. W. 930; State v. Carpenter, 124 Iowa 5, 98 N. W. 775; State v. Snider, 119 Iowa 15, 91 N. W. 762.

To this instruction we can see no objection. Instructions of this character have been given and have been approved by this court. State v. Taylor, 196 Iowa 1015, 1020, 192 N. W. 294; State v. Heath, 202 Iowa 153, 209 N. W. 279; State v. O'Meara, 190 Iowa 613, 624, 177 N. W. 563; State v. Bige, 195 Iowa 1342, 193 N. W. 17; State v. Harding, 204 Iowa 1135, 216 N. W. 642; State v. Loucks, 218 Iowa 714, 253 N. W. 838.

On the whole, we are abundantly satisfied with the result in this case before the lower court. The defendant came to town; ran around drinking at various places; he goes out and picks up this girl; he takes her out to a lonely place; he says he kissed her and that she kissed him; she said that there the crime was committed. We are satisfied defendant was out hunting for trouble, and he got into, and he should pay the penalty. The penalty is none too great, and the verdict of the jury is fully supported by the evidence. Therefore, the judgment of the lower court is affirmed.—Affirmed.

STIGER, HAMILTON, DONEGAN, ANDERSON, ALBERT, and KINTZINGER, JJ., concur.